We'll move on to the final case on calendar today, Omidi. So counsel, as you approach Mr. Coleman, we're going to do hard caps, so you have 15. You're not going to steal his time, effectively. If you want to cede time to Mr. Searby, you certainly can do that. Mr. Searby, if you want to cede time to Mr. Coleman, that's fine, but you don't need to worry about Mr. Coleman gobbling up all your time. You'll have your time. Thank you, Judge. Thank you, Your Honor. Ben Coleman for Appellant Julian Omidi. Our plan was that I was going to address materiality and recklessness, and then Mr. Searby was going to address the government's expert in forfeiture. And so if the court is okay with that, I'll jump right into materiality. And what I want to make clear from the beginning, and I'm going to focus on one particular argument, is that in our opening brief, we made two arguments. The first argument was that the evidence was insufficient. And then the second argument was that the government proceeded under an overbroad theory of materiality or fraud, and therefore at least Mr. Omidi was entitled to a new trial. Those were two separate arguments. I want to focus on the second argument. And the reason why I want to make that clear is because the government in a recent Rule 28J letter has claimed that we have somehow waived what they're calling a Millhiser claim, and I think Millhiser is important to this case, but we made the exact same claim in our opening brief that Millhiser did, and it's at page 24 to 28 of our opening brief. Now, what the government did in its response was that it collapsed everything into a sufficiency claim. And you can't fault us for the government's failures, and where I think the waivers occur here are really on the government's side, because the government, I believe, has waived the harmless error argument because they've never raised a harmless error argument as to our overbreath claim or improper pathway to conviction claim. And also on the standard of review, I believe the government has waived any claim that we have not preserved our claim of overbreath, because the government's, the only fault that they have with respect to the preservation is that the Rule 29 motion wasn't preserved. Even assuming they're right on that and we disagree, that does not control our overbreath claim, which is a claim for a new trial, and that claim was certainly adequately preserved. We filed a written motion asking the district court to prevent the government's witnesses from articulating this type of overbreath theory and this type of theory of materiality. In the jury instructions, we specifically objected that the instructions did not include an essential benefit of the bargain definition for materiality, and not only did we object, but we also requested that the court instruct on the essential benefit of the bargain. So this claim is reviewed de novo, this particular claim about overbreath, and the government has not claimed harmless error in their brief as to that claim, and therefore they've waived the harmless error argument. And that's why I think now, if I can get to Millhiser, why Millhiser is really important here. It was the exact same thing in Millhiser. The defense made the overbreath claim, and I think Millhiser shows that our claim was also correct in that regard, and then the government waived any type of harmless error argument. And here what we have is a claim that, by the government, at trial, it was repeated throughout the trial in the witness testimony and repeated in closing argument, and this theory of fraud and materiality repeats itself over and over again in the government's answering brief, is that any type of false statement would have led to the denial of the claim or would have led to further investigation. And that's just simply not an accurate statement of materiality after Millhiser. Millhiser makes clear that the false statement has to go to the essential benefit of the bargain, so that if the claim was otherwise covered, a jury could easily find, under the essential benefit of the bargain standard, that just because there was one false assertion in the claim packet, that does not mean that the government has shown materiality or fraud. Let me ask you this. So what would satisfy your version of Millhiser? I'm not saying Dr. Amidi did this or didn't do this, but, you know, let's say post-Millhiser, what is a viable health care fraud claim? Well, I think it would be that the claim was not medically necessary, and that the, if, or the claim just wasn't performed. I mean, that certainly would be one, correct? Sure. So that would be number one, you're billing for something that you just didn't do. But in a case like this, where the services are provided, that the claim was not something that the insurer was obligated to compensate for, that would be materiality. And the problem we have here is that the government never introduced the governing plans that governed when something should have been covered or not covered. There was plenty of evidence in the record that, for example, on lap band surgeries, that the people qualified for lap band surgery, even if you would put aside the sleep study report, that because of their body mass index and because of their other comorbidities, they would have qualified for the lap band surgery anyhow. So when you have that type of record, and you. I guess I don't quite understand where you're going with this. Isn't the way we have to look at this, the old basic standard, that would it have a tendency to affect the outcome? If there are false reports, false testing that's being submitted to the carrier, that is going to have a tendency to have an impact on the decision. You don't have to prove, do you, whether or not it would have been covered in a particular instance. It's the nature of the falsity. And the nature of the falsity here is a pretty significant falsity, false studies, which would have a tendency to affect the decision by the provider. So I don't, I guess I don't quite see where you're going with this. Well, I think that Millhiser has sort of cut down on that theory of materiality that Your Honor just articulated. Isn't it objective or, is it an objective test? It is an objective test. Okay. So it's, we take a look at the falsity and we say, does, is this the, is this the sort of false statement that would likely have an impact on a decision being made by a provider? Isn't that how they analyze it? I really don't think so, Your Honor, after Millhiser. And that's because, I mean, that was the same thing that happened in Millhiser, is that the victims would say, look, we never, in that case, they were buying toner. Okay, and the victim said, look, we never would have bought the toner had these misrepresentations not been made. I mean, that was their point. And this court said, no, that's just not good enough. The question for fraud is, did the victims get deprived of the essential benefit of the bargain? Simply saying, well, we don't, you know, we don't, we wouldn't have entered into the transaction. That just no longer suffices under Ninth Circuit law. And other circuits are in agreement with that. It's the same, the DC Circuit, the 11th Circuit. I think at this point, the majority of the circuits are in agreement with that. I guess where I'm having trouble is, I'm hearing what you're saying to change what I think is an objective test into a subjective test. That's what you're doing here. Now, maybe you're saying Millhiser stands for that proposition. But I don't think that it does. No, and I think we're moving from a subjective to an objective. Because under Your Honor's articulation of materiality, you're saying you're the victim. I wouldn't have done this. I wouldn't have engaged in this transaction. It's subjective. You know, I personally, even though I got the essential benefit of the bargain, I myself subjectively would not have entered into this transaction. That is an incorrect subjective test after Millhiser. The question is objectively, did you get the essential benefit of the bargain? Did the misstatement go to the- misstatement is of the type that would be important to the provider. You're not, you're saying that's not the way to look at this. Well, I'm saying that, would it be important to the essential benefit of the bargain? I think that is the clear, after Millhiser, that was the problem this Court articulated with the materiality instruction and the materiality theory of the government, was that it just said, you know, the government's theory was the victim said they wouldn't have engaged, it was important to them and they wouldn't have engaged in the transaction if they had known about this falsity. And this Court said, nope, that's just not good enough for fraud. It has to be, were they deprived of the essential benefit of the bargain? I thought the fraud here was with the insurance company. Correct. So when you talk about victim, you're talking about the patient? No, the insurance company. You're talking about the insurance company. The question would be, did the insurance companies get deprived of the essential benefit of the bargain and that they were paying for procedures that they were not obligated to pay for under their plans? That is the test. Well, they were given false information, though, in many instances, right? Correct. Even assuming that is the case, the argument is that there was, the false information did not necessarily mean that the people were not covered for the procedure. The false information was an extra, there were other bases for the coverage of the procedure. And in this case, we don't, the government didn't introduce the plans. Now, I'm saying put aside, the court may say, look, we think the evidence was sufficient to support the convictions, even under my articulation of, and Milhiser's articulation of materiality. What I'm arguing is that the theory that the government included in their prosecution, with their witness testimony and their arguments, it went too far. It said that it doesn't matter. Any false statement, the insurance companies either would not have paid the claim, even if the false statement. They're not saying any false statement. I think that's, I don't think that's fair to the other side. They're saying this kind of false statement, false sleep studies, are so significant that it would be a basis to say, even if there's other reasons why somebody might qualify for coverage, they're saying that that is such a material falsity. They're not saying any false statement, because I don't think that's fair to the government's position. Well, Your Honor, I respectfully think they did articulate that, and their witnesses said that. Well, but that's not our case. The case, what I'm saying is, you don't dispute what was submitted here were false sleep studies. Correct. Let's assume that there were false sleep studies. And their position was, and this is to get around the problem that they didn't introduce the plans, and that the patients may have otherwise been covered. Put aside the sleep studies, given their body mass index, for example, and given their other comorbidities, they would have been eligible for the lap band surgery. Let's just use that example. To get around that problem, the government's position, their witnesses testified, and even in the closing argument, was health insurance companies, their view is if there's any false information in the claims, we're entitled to deny the claims. So long as it's material. And what's material is a false sleep study. But their position wasn't it had to be material. Their position was, if the statement is false, either we can deny the claim, or their other theory was, we would have investigated further. That's their argument. With the time I have remaining, but what I saw, I just want to make clear, just before I move on to Radcliffe's, and this is, number one, this issue on the over breadth of the theory, which only would get us a new trial, not judgments of acquittal, is viewed de novo, and the government has not articulated a developed harmless error argument as to that claim. Now, with respect to recklessness, I think one of the problems with the court's precedent, and I really think it should be clarified, is that there are cases that go in different directions, and part of the problem is that we have different statutes that are involved, the plain language of the different statutes say different things, and then we have different jury instructions that are given in different cases, and it's kind of mixing apples and oranges, and really the government, they're heavily relying on this case called Deering, and I want to explain kind of why Deering doesn't control this case, number one, and also, number two, where Deering went off the road, sort of. Now, I think the clearest example for here, and let's start off with two of the statutes we're dealing with. We have the property fraud statutes, and I'm going to put them aside for a second. We're dealing with section 1035 and 1028A. Now, 1035 cannot be any clearer. The statute says knowingly and willfully. That's the language in the statute, and there's just simply no way that a reckless indifference standard can we've moved from a statute that specifically says knowingly and willfully, and we're allowing it to be satisfied by reckless indifference, and that obviously has to be wrong. Reckless indifference is not knowingly, and it's certainly not willfully, and the same thing with 1028A. It says knowingly. Knowingly cannot be satisfied by recklessly, and where we went off the side of the road is that Deering did not involve the statutes that are involved here. Deering involves section 1347, so this court does not have to overrule Deering because it addressed a different statute. This case does not involve 1347. The instruction in Deering was also different, and I'll get to that, but where Deering went off the road is that Deering said that reckless indifference could satisfy knowingly and willfully, and it cited a case called Turalo, which the court may be familiar with, but the problem is that Turalo addressed securities fraud in Title 15, a provision in Title 15. The statute at issue in that case did not use the language knowingly and willfully. It just used the term willfully. That was it, and what this court said is in the context of securities fraud, willfully does not require Bryan versus United States willfulness. It doesn't require knowingly either. It just is a general wrongfully standard, and in that context, reckless indifference is okay, but the statutes that we're dealing with here, 1035, 1028A, they say knowingly and willfully, and the government has conceded in a case called Ajoku, which came after Deering, that 1035 requires Bryan versus United States willfulness. There is just simply no way that a statute that requires Bryan versus United States willfulness and that's explicitly in the language says knowingly and willfully can be satisfied by reckless indifference. I mean, it counters. Can I jump ahead on this? Isn't it a bit of an academic point in this case when we're fighting about all this? I mean, the bottom line is that there was considerable evidence of direct involvement by OMIDI in micromanaging all of this activity. So we can have an academic discussion about reckless indifference and what would be the appropriate instruction, but at the end of the day, at most, wouldn't it be harmless error here because the evidence is overwhelming against Mr. OMIDI? Well, we dispute that it was overwhelming, and before I get into why it wasn't overwhelming, I guess the first question is. Well, actually, and I respect that, but am I correct that if, in fact, we conclude that there is considerable evidence of direct involvement by OMIDI, that all of this is somewhat academic, if we conclude that? Well, if the Court finds that there was overwhelming evidence of a knowingly and willfully mens rea, then, I mean, under Nieder, the Court has said that you can engage in a harmless error analysis. Now, I think you have a problem under Nieder when, if you agree with me on the materiality point and you agree on the recklessness point, then you have sort of a doubly overbroad theory. You have two fundamental elements of the offense that have been misinstructed, and Nieder talks about a single element of the offense can be harmless error. But if you agree that there are two significant and critical elements of the offense that are tainted, I'm not sure that you could go there. And in addition, we also do have a constructive amendment claim for which harmless error doesn't apply. But I do want to get to Your Honor's question about wasn't the evidence of knowledge and intent overwhelming. And the bulk of that evidence, of the direct evidence, comes from their cooperating witnesses. And these cooperating witnesses have particular problems. And this Court has said in many cases that, you know, testimony from cooperating witnesses is not the type of overwhelming evidence that is going to supply for which we could ignore critical errors such as errors that go to the fundamental mens rea for the offense. Now, there may have been other circumstantial evidence that the government introduced to show that, oh, well, he must, that he knew, but the, that he was a micromanager and that he was reviewing charts. But they, there were other, there were doctors involved here who were reviewing the same charts. Those doctors were not prosecuted. Nobody said that, you know, that they knew. They were reviewing the same charts that Mr. Omidi was reviewing. He had hired, you know, he had hired people to manage the sleep study program and he was relying on them. And so I don't think the evidence was overwhelming. The only, the strongest evidence came from their cooperating witnesses. And that's just simply not the type of evidence that would be considered overwhelming. Your position is cooperating witness testimony is, we have a whole collection of cooperating witnesses and because they're cooperating witnesses, that isn't significant evidence. That would be a new proposition for me. We have a lot of cooperating witnesses in our case. Well, I'm not saying that you can't rely on cooperating witnesses, but this Court has said in cases like Bailey, it said it in Obagi, written by. Well, it certainly goes to the credibility. You have to analyze that. I'm not disputing that. But a lot of criminal cases are based on cooperating witnesses. And as far as I know, that's what we call evidence. I'm not saying it's not evidence. I'm saying it's not overwhelming evidence. Certainly a juror. And again, look, the Court may have its own experience with cooperating witnesses and may view cooperating witnesses one way or the other. But that's not what harmless error analysis is for this Court. It's could a jury sitting there, could a jury say, look, we're not going to believe these people. They've got all sorts of problems. They've lied over and over and over again. Not only are they getting sentencing benefits for custody, they're getting no custody time, but they're not having to pay any restitution. They're literally being paid. They don't have to pay money because they're not being saddled with restitution and these other things. Certainly jurors could sit there and say, you know what, we're just not going to credit that. And they do often, jurors reject cooperating witness testimony. So to say that a case is overwhelming when the, you know, the large bulk of the direct evidence of his supposed knowledge and intent comes from the cooperating witnesses, we don't think that shows harmlessness beyond a reasonable doubt, which, of course, is the highest standard. I see I'm ticked down a few seconds. We'll have your rebuttal. Thank you. Thank you, Mr. Coleman. Good morning and may it please the court, Edmund Searby for Mr. O'Meady. I stand in today for Lawrence Robbins, whose briefs are before you. He became too sick to complete this appeal. And in fact, he passed away last week. Sorry to hear that. Your Honor, I'd like to begin where my colleague left off and make a couple points. One, as far as recklessness, I think the court's heard a lot and is going to hear a lot about whether Deering controls or other cases control. I would simply very quickly encourage the court to consider the Supreme Court's decisions in Borden and Global Tech and this court's en banc decision in Gracidas Ulibarri. All these decisions endorse the model penal code's hierarchy of mental states. And I believe that is the solution to coherent law on whether recklessness can satisfy a more serious mental state. Going to the court's question about Mr. Klaski and whether the recklessness instruction should be deemed to be harmless in light of the evidence that, in fact, Mr. O'Meady directly directed this fraud through Mr. Klaski and to a lesser extent through Mr. Hong, I would encourage you in the brief to take note of the area where it points out that Mr. Klaski, while testifying, that he was directed to falsify these scores in order to get lap band surgery approved. In fact, when you look at the scores, you see there's no rhyme or reason to them. Mr. Klaski is sometimes raising them when you don't need a sleep study score to get lap band surgery approved and sometimes he's even lowering the scores. And I submit to the court that the government's solution to the problem of their own evidence that it really didn't submit, it really didn't, wasn't consistent with their own theory was what is accurate information theory. And what's clear is during even the pendency of this case, but even before this case, there is controlling case law that, first of all, all deception is not federal fraud. And there are controlling decisions to eliminate what's known variously in the circuits as right to control theory or accurate information theory. And I urge the court to look, as my colleague pointed out, at the actual testimony of the insurers who testified in trial as well as the government's own brief in this case at page 2, at page 20, page 30, and in other places. The government is clearly relying on accurate information theory. They are relying on the fact that any falsehood is material. And that's the testimony they offer. Did you require complete and accurate information on all claims? Oh, yes, we did. The problem with this theory is the court should think about how expansive it begins. In every case you can ask somebody, do you require complete and accurate information? If I go out and buy a used car and I get exactly the car that I was represented by the salesperson to get, but I'm told later that the salesperson had a lapel pin for the Marine Corps and, in fact, they never served, and you ask me, was that material your decision, I'd say, oh, yes, stolen valor. I never would have bought a car from somebody like that. But, in fact, I got the benefit of the bargain. And the arc of the law has been to recognize that federal fraud needs to get cabined. And that's really what happened in Millhiser and before that in Brueghausen. And that's where the Supreme Court's headed in Simonelli. Well, let me just ask a question then. So if I go to the grocery store and I want to buy eggs and I look at the box of eggs and it says USDA inspected, and I buy the eggs and we eat the eggs, it turns out that they were not USDA inspected. I would not buy eggs from my family that were not USDA inspected. You would say that's not fraud? I would say that's a close call, but that's going to the terms that we would believe are the benefit of the bargain. Basically, that that product is what it's represented to be. How is that different in this case where they're having the doctor play the role of the USDA and say I'm certifying that this is correct, this is what happened? How is it different? I understand the issues of Millhiser. I'm not sure where we go with Millhiser. I'm just not sure this is the case. Explain to me why this case is not the crux of the bargain between the insurance companies and the doctors here. Because, as the government said, 85% of the loss is in lap band surgery. In many of these sleep studies, the sleep study was completely immaterial to whether the lap band surgery would be approved. And let me illustrate that by going to an issue in the case, and that was the admission of the expert, Mr. Patron. And he put before the jury, and the reason I want to talk about it is it's an error in its own right that I believe was significant to the basic fairness of the trial. It also illustrates the issue that we're talking about of materiality and how wrong this was. And Patron testified to the jury that basically there was 353.4 million in intended loss and 71.3 million in actual loss, and that he could testify to the jury on a 95% confidence level. And the district court should have kept this testimony out under its gatekeeper function, under 702, because Patron took his assumptions of fraud and loss, not from doctors, not even from insurance experts, but from the prosecutors. And his primary assumption was that any change to a sleep study is fraud. And there are a number of basic problems, but in my limited time, I want to hit two of them. One is, in order to say that any change is fraud, they needed the baseline to say what it was changed from. The baseline here were the draft Zarabi reports, and they were offered for the truth of the matter asserted. The court erred in admitting these as business records. They were not authenticated by a person with knowledge. Michael Zarabi was not even at the trial. They were not reliable. Zarabi, and I mean no disrespect, like Klasky, is a person with a serious mental illness. He admitted the data was so corrupt that he used his own imagination to make the numbers up. And he listed just these impossible results. He listed sleep apnea events where people weren't breathing for six, seven, eight minutes. They would have died. It was clinically impossible. But that's what the government is saying is the truth, so any deviation from that is false. The other assumption underlying Patron's testimony that really gets us back to the materiality thing and illustrates how wrong this was is any change is loss. So a one-point change in a sleep study score under Patron's methodology that he adopted from the government would be loss. And what is that? That is an accurate information theory. It's disconnected from the actual approval criteria. It's disconnected from the real issue here, which was the healthcare fraud had to be proven by proving that there wasn't medical necessity. But what do we see when we get into his data? In his sample of 250 patients, he identified 47 that had an altered sleep study score and received lap band surgery. And he counted those all as loss and then magnified that over an 8,000 patient population to come up with this gigantic loss number that was so prejudicial and the jury heard. Excuse me. The problem is when you get into those people that he counted as loss, you see that 26 of the 47 had a body mass index over 40, which the evidence in the record shows meant they automatically qualified for lap band surgery. The sleep study was completely immaterial. Another 17 had a body mass index of between 35 or 40, which means if they had another comorbidity such as diabetes or hypertension, they also qualified for lap band surgery irregardless of what their sleep study score. But Patron never looked to see if they had another comorbidity. He just counted it as loss and fraud because there was any change to the sleep study report. No reasonable person would believe that in those instances the change to the sleep study score was material. I see my time is winding down. I wanted to get to permeated with fraud. We're over time, so you've got about, I'll give you 30 seconds. Thank you, Your Honor. Just very quickly, permeated with fraud, we disagree with the government. Ninth Circuit's decision in Rutger says that, clearly says that that theory should be limited to, you know, an all-record search in the Fourth Amendment context. And I think Rutger's controlling. I was going to say, there's a lot of other circuit authority that would disagree with you on forfeiture. I don't think Rutger squarely presents this. So are you saying that, you're saying Rutger controls, like we are bound by Rutger? They say the conclusory phrase is too loose and indefinite to constitute a finding by a propouncer of the evidence absent specific supporting evidence. In any event, they didn't prove permeated with fraud here. The government acknowledged that there were substantial legitimate earnings from this business and looked at what the district court did on restitution. The district court rejected Patron's findings, and in doing that, noted that there were bariatric surgeons here who made independent decisions on medical necessity. And for that reason, you know, those transactions all would have been legitimate. The government's argument to take everything is this absurd syllogism that basically the government acknowledges there was tons of legitimate business here. All patients entered the call center. Some patients received false sleep studies. Therefore, all payments were obtained for fraud. The last thing I'll say, and I'll sit down, is the government argues and compares this case to Warshak. This case is distinguishable from Warshak on this grounds. In Warshak, the theory to take the alleged legitimate earnings was that the fraud predated it. The business began with one fraudulent product, and they committed fraud on merchant banks to get the ability to charge cards. So the argument was that the later billings that were legitimate were the product of the earlier fraud. It's the opposite way in this case. They never proved this call center scheme, and if you look at their own indictment, you'll see it contradicts what they're telling to this court. Basically, that the legitimate business began in 2008 or before, looked at their indictment, and the sleep study program began in 2010. So those, the legitimate earnings were not the product of the fraud, and permeated with fraud can't be magic words, as the government says, and then they just take everything. All right. Thank you, counsel. And Mr. Coleman, you still have your five. All right. You got it. Good morning, your honors. May it please the court. Saria Bahadur on behalf of the United States. So I'll start with materiality as well. The defendants did not argue what they have been arguing here today in their briefs. Their opening brief, the question presented was, may the government prove materiality without insurance plans. And in their reply brief, they asked for dismissal for, quote, want of sufficient proof. They argued a sufficiency claim. They challenged the government's evidence. They did not challenge the government's legal theory. In terms of, just to go into the Millheiser question, because that's where the court was going, Millheiser says specifically, when the misrepresentations are directed to the quality, adequacy, or price of the goods themselves, the fraudulent intent is apparent because the victim was made to bargain without facts essential in deciding to enter the bargain. So in your egg example, if you were told something that went to the quality of those eggs, that was fraud, that's material to your decision, Judge Owens. That's exactly what happened here. The quality of these sleep studies, there was no quality of these sleep studies. They were fraudulent. They were not legitimate. And I think the best quote on this, if I may, is from one of the insurers themselves. And it's at ER 35. And Carl Reinhart said, if results are altered, the sleep study is worthless to me. We would pay, and we would pay for it because I'm not getting what I ordered. I'm not getting a legitimate sleep study. So the insurer is specifically saying, I'm not getting what I ordered. I'm not getting those eggs that have a USDA approval on them. So this is simply not the case where there were actually services that were rendered. And I actually think counsel inadvertently conceded a Milheiser point here. He said it would be appropriate under Milheiser, for example, if the claims were not medically necessary. The claims here were not medically necessary. There was not a doctor who was referring these patients for sleep studies. There was not a doctor who was actually interpreting these sleep studies. There wasn't a doctor doing these medical necessity determinations that insurers expect when they're paying for their services. Defense counsel also said that if the claims, I think, themselves were not performed, if the services were not performed, same answer. Were there any legitimate, just as, I know this goes to a different, kind of a different point, but just as you're mentioning this. Sure. Were there any legitimate studies? I don't believe so. And I don't even think that they can say that on this record. Because when they're going through these BMI's and they're talking about BMI's that were over 40 and these other comorbidities, that's all coming from the same bucket. The same bucket of fraud. The same bucket that, the same patient reports that were all going through this call center. All the same records that were being developed by GetThen. And so that fraud was pervasive. So what they're doing now is trying to pick portions from patient files and say, well, that BMI was over 40, so the sleep study was immaterial. There's no way of knowing if that BMI was accurate. And actually, it's fraudulent, frankly. Because coming to that decision, you're putting these patients through services that are not even medically necessary to make those appropriate determinations. And so I honestly think it's just counterfactual. And it would require the court to engage in a counterfactual that simply the jury was not engaging in. They were looking at the fraudulent lies that were in the sleep study reports. I mean, it's also not just sleep study reports. There's fraudulent prescription. And that's garden variety healthcare fraud. If you put a doctor's signature on a prescription and they didn't actually conduct an individualized, you know, assessment with a patient and prescribe them a CPAP device, there's no medical necessity determination and there's no actual service that's being performed. It's just garden variety fraud. And I think if the court were to accept this new sort of Millhiser concept in this particular case, I'm not sure what fraud would be going forward. And here you have very core lies. And the government was very careful in closing argument. They specifically said the lies had to affect insurer's decisions. And then they went through line by line the specific lies that matter to insurers. So we respectfully believe that this claim is completely waived. It was all about sufficiency when we actually put pen to paper with the briefing. But now if this court engages in this Millhiser theory at all, we think that we prevail completely under Millhiser. Unless the court has more questions on Millhiser or on our theory of fraud, I can move to recklessness. Okay. In terms of recklessness, just to be clear, the instructions were not a recklessness. It was reckless indifference. It's a big difference because when you have the word indifference in there, you have to know something exists to be indifferent to it. And this court has held many times over that this reckless indifference instruction is permissible. And the other side talks about deering, but and deering may have involved a different statute, but I would just point this court to Gaye. In United States v. Gaye, the court said we have repeatedly upheld a reckless indifference standards in a male fraud case. Let me ask counsel because I was reading closings as I always do when I get the cases like this. I did not see a heavy discussion of recklessness in closing. I think it might've been referenced in terms of referencing the jury instructions, but I didn't see it being argued. Am I correct in that? That was not the thrust of the closing? That's absolutely correct. There was, as in any closing, the government typically reviews the jury instructions with the jury and talks about, usually it's pretty verbatim from what the jury instructions say. The courts make sure that we do that as the district judges know. And that's all that the reckless indifference, that's the only time it was featured. When it was, when the government was going over that language. And the court was exactly right. It is academic. The theory at trial was that the defendant not only knew, but he led and directed this fraud. And this idea that it was just based on a cooperator testimony or cooperators generally is also not based in the record whatsoever. First of all, if you look at that cooperator testimony, it's 11, it was 11 trial days. So it's quite a number of volumes, but for the four days of the direct, it is a heavy document case. And you can tell that based on the number of exhibits. And if you read through that direct testimony, the prosecutor is guiding that cooperator through documents. It's not your typical cooperator eyewitness testimony, where a lot of the defendant's cases were really just, you know, the case relied on that one particular witness. That's absolutely not this case whatsoever. And of course, there were 16, I think, get thin former employees that testified. And many of them said that Julian Omidy was quote, the big boss and quote, everyone reported to him. That was from Petrukowski, not a cooperator. There was also a Carriedo, not a cooperator. And he testified, Julian Omidy quote, was in charge of all decisions as it related specifically to the sleep study. There's multiple witnesses over and over again. And the government absolutely in closing argued that Omidy set and reviewed get thin policies and procedures. He was the one that asked the call center to sort patients by profitability. He was the one that said it's mandatory for patients to undergo two sleep studies. He was the one who directed the falsification of sleep study reports. And he was the one who mandated that the lies and the fake reports be sent to insurers. So we do think that it's entirely academic. And that was the government's closing to the jury.  And I mean, in terms of recklessness, again, it's all academic, but we do think that the court's cases permitted exactly what the district judge did here. And just touching on, I think the evident evidentiary issues that, that council talked about this district judge lived with this case for quite some time. I think it was before judge G probably for seven years, there was, I think four years of pretrial litigation before it went to trial. And of course trial was about, uh, you know, three months, but in terms of Mr. Petron's testimony, judge G had pretrial briefing on this issue. She ordered a written ruling on this issue. Uh, even though she had decided that this testimony was permissible expert testimony, that it was irrelevant. She allowed the defense to voir dire this witness and, and that voir dire took up, I think close to a morning where she allowed, uh, both defense, um, to, to cross-examine this expert. And at that point she had determined that his testimony was admissible. She was careful. She, um, her decision was well within the range of permissible decisions, uh, that a district court can make when it comes to experts. And then in terms of what that expert relied upon, uh, the Zarabi reports, again, those came in under the business records exception. And judge G again, was very careful in that regard. And in terms of on an abuse of discretion standard, her decisions were well within the range of a permissible decision. And then just moving on to the forfeiture. Sure. I think record, uh, judge Owens, you're correct in terms of record, um, that there's other cases out of circuit, uh, that I think are more, that are more relevant to what was actually presented here record. If you actually look at the quote that, uh, defense hangs, it had its hat on, which is that a hundred percent of fraud. Um, and that's the only way you could possibly get, um, a forfeiture in this context. If you go down, um, into the record decision, it specifically says, um, you need to have specific supporting evidence. And so I don't think record, which obviously involved a completely different statute. Uh, I think it was 1957, which involves specific tracing that's required. And this is a point that judge G made in her order that of course, you know, if you have a tracing statute, you're not going to be able to forfeit those indirect proceeds. So respectfully, we don't think record is on point and it would be helpful to clarify that that record is confined to that particular statute and to that narrow set of facts. And we think here yet again, judge G was careful. Um, I think the calculation of the amount is reviewed for clear error and the government only had to show facts by preponderance of the evidence. And we do think here that the fraud was pervasive, pervasive, that we met that standard to show permeated by fraud doesn't meet a hundred percent of the business has to be fraud. It just means it needs to be pervasive that the central purpose has to be, um, that fraudulent purpose. And we do think that the record establishes that. Your counterparts here suggest that, uh, if I understood their argument, that there's some inconsistency. The point is a point to the restitution award and the forfeiture award is somehow inconsistent and demonstrating therefore that there's a problem. Uh, I don't necessarily agree with that, but I want to tell me why that, that shouldn't the fact that there is a difference in the judge G said that certain, um, aspects of restitution were she wasn't going to award because there were doctors that were reviewing the, uh, kind of a second tier of review. And that didn't play into the forfeiture. Why should that not be a problem? Absolutely. So it's not a problem because there's different legal standards at play. Restitution is, is, um, may, is the purpose of restitution is to make a victim whole. Um, and it's also, so it really looks at actual losses and it's really going to the V it's the perspective is looking at the victims. What did the victims suffer? And it's also governed by, uh, but for causation and proximate causation. And so when judge G, uh, made that observation that she thought that down the line there was, it was possible that there were these physicians who did an independent, um, review, you know, in our position, we don't think that there's support that there was evidence of that actually happening, but we respect judge G's decision. Um, you know, we didn't appeal that, but we don't agree with it. Even then that was based on approximate cause standard. If you look at forfeiture, forfeiture is basically, you're asking a completely different question. You're asking whether the proceeds were directly or indirectly obtained from the fraud. And so we're really looking at the money that's coming in, uh, to get thin and then how that money's being used. And if you look at the government's forfeiture briefing, which is in volume three of the ER, it has a lot of charts that show exactly how the forfeiture is just looking at a different perspective. It's looking at how you have third party insurers and you have individual patients who were sending their money to get thin and how they were going into these five bank accounts where they came to rest. And then how, um, those that money was then being pushed out to other get thin entities to further the fraud. And so forfeiture doesn't have, it has but for causation, but it doesn't have proximate causation. So it makes sense why judge G, I mean, she appropriately was looking at each, um, whatever concept it was, whether it was loss, intended loss at sentencing, which is a completely different standard, whether it was restitution, which is actual loss and subject to proximate causation standards or forfeiture, which just has the but for causation, but is looking at the way the insurers were paying rather than what the insurers were losing. Um, I think judge G, uh, got it right. So let me, let me go ahead. Let's go ahead. I don't, I defer to you, judge Pius. I'm just going to say, did they pay for any, any legitimate? Did they? Yeah. Lap band surgeries. To be, I don't think the record supports that. Judge G's, judge G's conclusion was that she believed that there was, uh, I think, uh, a reference in the record to patient notes that made a reference to an, uh, an independent evaluation being done by a physician. But other than that reference, we take the position that there's no evidence in the record that that was actually being done when the lap band surgeries were being deformed down the road. So it's the government's view that from the get go, everything was fraudulent. Yes. I mean, when the money exchanged hands, um, which is, I mean, what we look to fraud, I know we're mixing concepts here, right? Fraud and forfeiture. But when the money exchanged hands, it exchanged hands because get then was submitting a claims, a claim or they were submitting a pre-approval request with fraudulent information and had the insurers known that they would not have sent that money. So it was fraud from the beginning. So the reason why for the claims, they were just seeking money to get reimbursed for the pre-approval requests, which is synonymous with the letters of medical necessity for lap band surgeries that was just unlocking the right to bill. And again, when the money was exchanging hand, it was all based on fraudulent information. Those letters of medical necessity, for example, they attached a sleep study report that was falsified and that had a physician signature on it, even though that physician did not interpret, did not order or did not interpret that sleep study for that patient. So it kind of all goes back to the fraud arguments I was making earlier, but we do think that it was fraud from the get go. And we don't think there's facts in the record that there were this, you know, group of physicians doing independent reviews down the road. Judge G made that call based on proximate causation. And I think this is more in the loss context, but she says many times over that she's being conservative. By the time it got to sentencing, being conservative. And I think at one point she even said, I'm not questioning that there wasn't any liability as a result of what happened, but she was in a different world with different standards at the sentencing phase. So I have a hypothetical to ask. I just want to understand for your forfeiture theory, imagine a scenario where someone goes to their doctor, the doctor says, look, you are obese. You're going to have to get lap band surgery. And so I'm going to refer you to USC medical. So I'm on the way driving home and I see the billboard for 1-800-GET-THIN. And I say, Hey, that, that looks pretty good. I'll do, I'll just, I don't like USC. I'm a UCLA guy. I'm going to go to 1-800-GET-THIN. In that situation where a doctor, and I'm not saying this happened in the case, but where a doctor has legitimately said you need to get lap band surgery. And I see the billboard and I go that way. Would those types of funds be forfeited when they, when a doctor has said, you know, you legitimately need it. In this scheme and the way that it was run. Yes. Yes. And explain why. Because those are say they are legitimate proceeds. I mean, you still have to deal with the fact that you have illegitimate proceeds that are all going to be gained by patients going through the same call center. And so just because you have legitimate and illegitimate proceeds together, doesn't mean that there's no forfeiture. And I think if you look at Warshak and maybe Gladden, they basically say if you have illegitimate proceeds that are effectively propping up the ability to earn legitimate proceeds, that's still forfeitable. And the forfeiture statute 981 is very clear on that because it's proceeds obtained directly or indirectly from the fraud activity. And I think your example is, is basically going to that indirectly portion and that, you know, it didn't happen like that in terms of your hypothetical, but there were people who came in who weren't interested in lap band, but who were diverted and referred to other services. And all of that would not have happened but for this call center or, but for this fraudulent activity. Plus there's evidence in the record that there was a directive to do to find something that, that get then could bill. And so it was part and parcel of the fraudulent activity. So unless the court has any more questions, I asked you about going back on the evidentiary rulings issues. And there's an interesting question about the admission as business records of these Zeribi reports. And I understand judge G that's the basis on which she admitted it, that they were 8036 records. And there your counterparts say, well you can't effectively if there, there's a collection of records that are not reliable and they're fraudulent or whatever, you can't use the business records model as the basis for you know, they're legitimate business records of a fraudulent activity. What's your view on that? So I, and I think judge G answered this. If, if that were true, then you would never be able to get business records from a fraudulent business. I mean, many businesses are engaged in fraud. We charge a lot of them and then maybe you're not admitting them as a business record. You're admitting them for other reasons. Yeah. Well, I should say to judge G's actual, her written ruling concluded that the Zeribi reports were admissible as party opponent admissions. When it got to trial, the focus was really on this business records exception, but there is actually a finding pretrial about a party opponent. So she admitted them on both based on her pretrial ruling. I think when it got to trial, the whole focus and I think it was well understood that these were coming in because if you actually look at the record, it, it, the discussion happens at, you know, volume sort of 41 and there's a little bit of going back and forth where the government says this was, we all thought that these were admissible at this point and then they go back into the business record exception. But I will say it's, the business record exception doesn't just necessarily exclude records just because there's falsities and inaccuracies in this, in, in them. And we cite a couple of cases for that proposition in our brief. And that makes sense because what the court, the purpose of the business records exception is whether these are records that are, you know, used in regularly conducted businesses. And if they're kept according to those practices and there's a plethora of evidence in terms of an abusive discretion standard that judge G had in front of her with respect to the Zerabi reports in terms of this, whether or not they were reliable. I mean, there was testimony that they were created at the same time as the studies themselves. There were other witnesses who had the report, the same identical reports, which the government was able to identify with really unique hash values. And the report itself, the Zerabi reports were different than the falsified sleep studies in the respect that they actually had an hypnogram that was attached to it, which was very specific data. And we talk a little bit about that in our brief, but that was not something that was in the falsified report, but that lends more reliability to the actual reports. The Michael Zerabi reports get then itself relied on these reports. And even though they knew that no doctor was actually interpreting them. And I think based on all of that evidence judge G in terms of the abusive discretion standard appropriately admitted them as a business record exception at trial. But you know, that pretrial ruling, I think she also gives a nod to the party opponent admissions rule. All right. Thank you very much. Thank you. We'd ask that the court affirm the jury's verdict and the district court sentence. Thank you. Your Honor, would you mind if I saved a couple of minutes for Mr. Zerabi? Cause there were questions about forfeiture and the evidence. Let me on the materiality and, and, and Millheiser. Um, the first thing I want to do is the government says we waived it and they go, Oh, look at the heading of their argument page 20. It's the heading of argument. Number one dismissal or at a minimum, a new trial is warranted on materiality grounds. Then a is the sufficiency claim. That's the, and then B is the new trial claim. We didn't, we didn't waive it. Now, your Honor, on whether this is a Millheiser case and the egg hypothetical, you are correct. If you want USDA eggs and you don't get the USDA eggs, you've been defrauded. But if your position is I will take eggs that are either USDA approved or approved from UCLA, then I will, I will buy the eggs and I lie to you. And I say that, um, the eggs are, uh, uh, approved by, um, both and it turns out that they're only approved by one. You still got what you wanted. You still got the benefit of your bargain. Now you may have civil claims. You may be able to sue for some type of, you know, um, for all, you know, civil fraud or something like that. You may have other claims available. You just haven't been federally defrauded, criminally defrauded. Okay. That that's the point of Millheiser. Um, and I think that goes judge Seesborg to some of your questions that there are differences between civil and criminal in this context. Now on harmless error, this is where I think we, why Millheiser held that the government waived harmless error is exactly for what came up happened here. The government just makes this broad claim that, you know, well, they were worthless. The sleeps, it was a false sleep study, whatever. We have multiple different counts and the different counts are fraud for different things. So for example, their lap, their lap band surgery counts. There was significant evidence and we've laid, laid it out in the briefs that these people that got them good lap band surgeries qualified regardless of the sleep study. The sleep study didn't matter because of their body mass index or, and their other comorbidities or just their body mass index alone. They qualify for the lap band surgery. This is a case. There was evidence that doctors, there were doctors that were signing off. These were surgeons who were not prosecuted. They were not giving people lap band surgeries that weren't medically necessary. They signed off on all these lap band surgeries. So if you want to do a harmless error analysis, you've got to go count by count. Let me give you another example. In our briefs, we, we, there was a CPAP. We, we, we, we addressed the one plan that they introduced related to CPAP, a CPAP that was given to a patient. And when we took their true numbers of the sleep study, and then we took the altered number of the sleep study, it didn't matter. The person had the sleep apnea that was required to get the CPAP machine. So there was no denial of the essential benefit of the bargain. So if you're going to do a harmless error analysis, which they haven't raised in their brief, they haven't done a developed one and they just get up and talk about generalities, you're going to have to go count by count by count. Okay. To, to do that harmless error analysis. We don't think we should be, we don't know exactly what their specific harmless error analysis, analysis position is as to each specific count. They've never alleged that. They just make this global harmless error argument. And you under a Millheiser approach, you cannot do that just a global harmless error argument. I did want to save some time. Thank you, Mr. Coleman. I appreciate that. Your honors, very briefly, a few points in rebuttal. I believe there was a statement made that a doctor never approved the sleep studies. I would call the court's attention. The government failed to preserve Dr. Zerabi's reports. It's a bit confusing because there are two Zerabis in this case. So there there's Michael Zerabi who creates the draft reports, but his brother reviewed those to create a final report. And the testimony, including from the government's witnesses supported that there's an element of interpretation to scoring a sleep study, to reviewing the raw data and the government failed to preserve that evidence. And it's troubling and it becomes all the more troubling when they stand up and they, they say that this was fraud because no doctor ever approved it. We lost the best evidence of, of what was approved and what wasn't. The, if I understood the argument correctly, the government suggested that there wasn't evidence of bariatric surgeons making their own independent judgments and medical necessity. Judge G says directly right in there that there was such evidence and there was, I mean, Charles Klasky was not performing stomach surgery. Independent doctors were. And I think Judge G came to these realizations late. It was too late. The jury had returned its verdict. It was too late to stop the farce that was Patron's testimony. But these points apply not only in restitution, they apply in forfeiture. Forfeiture is not this freewheeling world where the government gets to take everything. So I would simply ask the court that so much depends on an independent judiciary that will hold the government to the limits of the law. The prosecution in this case jumped the limits in, in a, a very gross way with its expansive theories. And we asked this court to reverse. All right. Thank you very much. Thank you counsel for your briefing and argument in this case. It's much appreciated this matter is submitted and we're done with the week. I want to thank Ms. Manning. Kwame, thank you for the tech help. We're done. Thank you.
judges: PAEZ, OWENS, Seeborg